IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION



FILED
IN OPEN COURT

DEC - 5 2025

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

v.

ALAN B. LEE

Defendant.

Case No. 1:25-CR-311

## STATEMENT OF FACTS

The United States and the defendant, Alan B. Lee (hereinafter, "Mr. A. Lee"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. Beginning at least in or about the summer of 2019, the exact dates being unknown, and continuing thereafter up to and including about January 2021, the exact dates being unknown, in the Eastern District of Virginia and elsewhere, Mr. A. Lee, together with Co-conspirator-1, Co-conspirator 2, Co-conspirator-3, and others, did unlawfully and knowingly combine, conspire, and agree to commit bank fraud in violation of 18 U.S.C. §§ 1344, 1349.

2. Mr. A. Lee and his co-conspirators conspired to execute a scheme or artifice to defraud Freedom Bank of Virginia ("Freedom Bank") by means of materially false or fraudulent pretenses or representations with the intent to deceive Freedom Bank and obtain Freedom Bank's property.

3. Specifically, Mr. A. Lee, along with his co-conspirators, fraudulently obtained six loans from Freedom Bank totaling $9,454,500. One of the co-conspirators was the recipient of these fraudulent loans (*i.e.*, the borrower), while Mr. A. Lee and the other co-conspirators received kickbacks, commissions, and/or payments from the fruits of the fraudulent scheme. The

1

fraudulent loans were related to three properties: a commercial property, a liquor store, and a convenience store. Mr. A. Lee and his co-conspirators obtained the loans by creating fraudulent documents reflecting an inflated income and net worth of the borrower and submitting those fraudulent documents to Freedom Bank as part of the loan applications.

## I. The Conspirators and Victim Bank

### a. Alan B. Lee—The creator of fraudulent documents

4. Mr. A. Lee prepared various fraudulent documents that CC-3 and CC-1 submitted to Freedom Bank as part of this fraudulent scheme.

5. Mr. A. Lee participated in the fraudulent scheme by preparing the following fraudulent documents: fraudulent tax returns reflecting inflated earnings for CC-2 and fraudulent bank statements reflecting inflated assets for CC-2. In return for these fraudulent documents, Mr. A. Lee received a kickback from CC-3 amounting to $5,000.

### b. Co-conspirator #1—A finance broker and facilitator

6. Co-conspirator #1 (CC-1) also acted as a finance broker for the fraudulent and as a facilitator by helping the borrower apply for and obtain the loans.

7. CC-1 participated in the fraudulent scheme by, among other things, communicating with employees of Freedom Bank on behalf of the borrower, communicating with Co-conspirator #4 (discussed below) about the loans, and providing information and documentation (both legitimate and fraudulent) about the borrower to Freedom Bank.

### c. Co-conspirator #2—The borrower

8. Co-conspirator #2 (CC-2) was the borrower and recipient of the fraudulent loans from Freedom Bank.

9. CC-2 participated in the fraudulent scheme by providing information and documents (both legitimate and fraudulent) to co-conspirators so that the information could be sent to Freedom Bank as part of the loan applications.

### d. Co-Conspirator # 3—A finance broker and facilitator

10. Co-conspirator #3 (CC-3) acted as a finance broker for the fraudulent loans and as a facilitator by helping the borrower apply for and obtain the loans.

11. CC-3 participated in the fraudulent scheme by, among other things, collecting documentation from the borrower (both legitimate and fraudulent), transmitting the documentation (including the fraudulent documents) to other co-conspirators, communicating with co-conspirators about the fraudulent documentation, and communicating with employees of Freedom Bank on behalf of the borrower regarding the fraudulent loans.

### e. Freedom Bank of Virginia

12. At all times relevant to this conspiracy, Freedom Bank of Virginia was a bank insured by the Federal Deposit Insurance Corporation, meaning that it is a "financial institution" as defined under 18 U.S.C. § 20. The co-conspirators obtained the fraudulent loans from a Freedom Bank office in Fairfax, Virginia, within the Eastern District of Virginia.

## II. The Commercial Property Loans.

13. In or about the summer of 2019, CC-3 was looking for a new buyer of a commercial property located in Camp Spring, Maryland. CC-3 had helped the then-current owners obtain the commercial property.

14. CC-3 found CC-2 as a potential buyer for the commercial property.

15. In or about the summer of 2019, CC-3 approached CC-1 to help CC-3 obtain a loan for CC-2.

16. CC-1 worked with a Freedom Bank representative to determine what assets, liabilities, income, and other financial considerations the co-conspirators would need to include on CC-2's application for the bank loans.

17. At CC-1's request, and as part of the fraudulent scheme, Mr. A. Lee created the following fraudulent documents:

    a. **PNC Bank Statement:** A bank statement from PNC Bank showing that CC-2 owned a bank account with an ending balance of approximately $1,401,600 in November 2019. This document is fraudulent because CC-2 did not have a bank account with PNC Bank.

    b. **Wells Fargo Bank Statement:** A bank statement from Wells Fargo Bank showing that CC-2 and CC-2's spouse owned a bank account with an ending balance of approximately $800,318 in November 2019. This document is fraudulent because CC-2 did not have a bank account with Wells Fargo Bank.

    c. **2017 Personal Tax Return:** A 2017 Form 1040 U.S. Individual Income Tax Return for CC-2 and CC-2's spouse, which listed their total income as approximately $260,000. This document is fraudulent because, in 2017, CC-2 and CC-2's spouse made approximately $133,000 in 2017.

    d. **2018 Personal Tax Return:** A 2018 Form 1040 U.S. Individual Income Tax Return for CC-2 and CC-2's spouse, which listed their total income as approximately $370,000. This document is fraudulent because, in 2017, CC-2 and CC-2's spouse made approximately $62,000 in 2018.

18. CC-3 worked with Mr. A. Lee, CC-1, and CC-2 to obtain additional legitimate documents for the loan application.

19. CC-1 then transmitted these fraudulent documents, along with other legitimate documents concerning CC-2, to Freedom Bank as part of CC-2's application for the commercial property loan.

20. During the time that Mr. A. Lee created the fraudulent documents discussed above, Mr. A. Lee knew that the documents were fraudulent and came to know that they would be used as a part of a bank loan.

21. The fraudulent documents influenced the Freedom Bank employees' decision to grant the loan to CC-2 for the commercial property.

22. CC-3 communicated with employees of Freedom Bank about the loan and collected other information from CC-2 and Mr. A. Lee that Freedom Bank needed to assess the loan.

23. In February 2020, Freedom Bank approved the fraudulent loan for $5,145,000 of financing for a stock purchase for CC-2 to purchase the commercial property.

24. In or around March 2020, CC-3 paid Mr. A. Lee $5,000 for Mr. A. Lee's work creating the fraudulent documents.

25. In the summer of 2020, CC-1, CC-2, and CC-3 asked Freedom Bank for an increase of $640,000 on the loan from Freedom Bank for repairs to the commercial property. In August of 2020, Freedom Bank granted the loan, in part, relying on the fraudulent documents that were submitted as part of the original loan.

III.    The Liquor Store Loans.

26. In the fall of 2020, CC-1, CC-2, and CC-3 sought additional loans on behalf of CC-2 from Freedom Bank for a liquor store located in Baltimore, Maryland. The loans were for

$1,164,000 for a commercial loan to operate the liquor store and $1,056,000 for the purchase of the commercial real estate where the liquor store is located, for a total of $2,220,000 in loans.

27. CC-1 then worked with a Freedom Bank employee to determine what assets, liabilities, income, and other financial considerations the co-conspirators would need to include on CC-2's application for the bank loans.

28. As part of the fraudulent scheme, Mr. A. Lee created the following fraudulent documents:

a. **PNC Bank Statement:** A bank statement from PNC Bank showing that CC-2 owned a bank account with an ending balance of approximately $693,000 in July 2020. This document is fraudulent because CC-2 did not have a bank account with PNC Bank in July 2020.

b. **2019 Personal Tax Return:** A 2019 Form 1040 U.S. Individual Income Tax Return for CC-2 and CC-2's spouse, which listed their total income as approximately $399,000. This document is fraudulent because, in 2017, CC-2 and CC-2's spouse made approximately $93,000 in 2019.

29. In addition, Freedom Bank relied on CC-2's prior loan application for the commercial property, including the fraudulent tax returns, bank statements, and personal financial statement discussed in Paragraph 17.

30. CC-3, along with CC-1, then facilitated the loan by obtaining documents from CC-2 and transmitting the fraudulent documents, along with other legitimate documents concerning CC-2, to Freedom Bank as part of CC-2's application for the liquor store loans.

31. At the time Mr. A. Lee created the fraudulent documents in paragraph 28, Mr. A. Lee knew that they were fraudulent and knew that they were being used as part of a bank loan.

32. The fraudulent documents influenced the Freedom Bank employees' decision to grant the loans to CC-2 for the liquor store.

33. CC-3 communicated with employees of Freedom Bank about the loans and collected other information from CC-2 and Mr. A. Lee that Freedom Bank needed to assess the loans.

34. In December 2020, Freedom Bank approved the fraudulent loan for $2,220,000 of financing for the liquor store.

## IV. The Convenience Store Loans.

35. In the fall of 2020, at the same time that CC-1, CC-2, and CC-3 approached Freedom Bank about the liquor store loans, CC-1, CC-2, and CC-3 sought two additional loans from Freedom Bank for a convenience store located in Halethorpe, Maryland. The loans were for $569,500 for a commercial loan to operate the convenience store and $880,000 for purchase of the commercial real estate where the convenience store is located, for a total of $1,449,500 in loans.

36. CC-1 then worked with a Freedom Bank employee to determine what assets, liabilities, income, and other financial considerations the co-conspirators would need to include on CC-2's application for the bank loans.

37. CC-3, along with CC-1, then transmitted the same fraudulent documents that were used to request the liquor store loans (discussed in Paragraphs 28 and 29) along with other legitimate documents concerning CC-2, to Freedom Bank as part of CC-2's loan application for the convenience store. At the time Mr. A. Lee created the fraudulent documents, Mr. A. Lee knew that they were fraudulent and knew that they were being used as part of a bank loan.

38. The fraudulent documents influenced the Freedom Bank employees' decision to grant the loans to CC-2 for the convenience store.

39. CC-3 communicated with employees of Freedom Bank about the loans and collected other information from CC-2 and Mr. A. Lee that Freedom Bank needed to assess the loans.

40. In December 2020, Freedom Bank approved the fraudulent loan for $1,449,500 of financing for the liquor store.

\* \* \* \* \*

41. In all, Freedom Bank suffered an actual loss of at least $2,879,500.00 as a result of Mr. A. Lee and his co-conspirators' fraudulent scheme.

42. In all, Mr. A. Lee received a total of $5,000 for his participation in the fraudulent scheme.

43. This statement of facts includes those facts necessary to support the plea agreement between Mr. A. Lee and the United States. It does not include each and every fact known to Mr. A. Lee or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding CC-3's case.

44. Furthermore, this statement of facts is an admission of Mr. A. Lee that can be used in subsequent court proceedings against him. This statement of facts does not constitute and is not part of compromise negotiations under Fed. R. Evid. 410 or any other provision of federal law. As such, defendant agrees that this statement of facts should not be excluded or suppressed under Fed. R. Evid. 410, Fed. R. Crim. P. 11(f), the Sentencing Guidelines or any other provision of the Constitution or federal law.

45. The actions of Mr. A. Lee, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Lindsey Halligan
United States Attorney and Special Attorney

Todd W. Blanche
Date: December 5, 2025                Deputy Attorney General

Robert K. McBride
First Assistant United States Attorney

By: _____

Gavin R. Tisdale
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between Alan B. Lee, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Alan B. Lee

I am Drewry B. Hutcheson, Jr., defendant's attorney.   I have carefully reviewed the above Statement of Facts with him.   To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Drewry B. Hutcheson, Jr.
Attorney for Alan B. Lee